ORIGINAL

FILED
SEP 15 2008
U.S. COURT OF
FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**PCL CONSTRUCTION SERVICES INC**

Plaintiff,

v.

No. 08-653 C

**THE UNITED STATES OF AMERICA,**

Defendant.

**COMPLAINT**

PCL Construction Services Inc ("PCL"), by and through its attorneys, Sherman & Howard L.L.C., alleges as follows:

1. This is a claim against the United States of America ("United States") for additional costs pursuant to the Changes Clause, FAR 52.243-1; GSAR 552.243-71, Equitable Adjustments; and the Contract Disputes Act ("CDA") of 1978, as amended, 41 U.S.C. §§ 601 et seq.

**STATEMENT OF THE CASE**

2. PCL incurred additional costs due to design changes directed by the General Services Administration ("GSA"). In general, these additional costs consisted of: (1) direct costs, and (2) impact costs caused by material price escalation. Part of these additional costs were paid by the GSA in a unilateral contract modification. PCL is entitled to an additional $1,046,371, plus CDA interest, as an equitable adjustment for changed conditions.

**JURISDICTION**

3. This Court has jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491 (a)(1) and (a)(2) and the Contract Disputes Act of 1978, 41 U.S.C. § 609 (a)(1). The Complaint is founded upon an express contract with the United States.

**PARTIES**

4. Plaintiff, PCL Construction Services Inc. ("PCL") is a Colorado corporation with its principal place of business in Denver, Colorado.

5. Defendant, United States, acting through the GSA, awarded PCL the contract referenced in paragraph 6 below.

**THE CONTRACT**

6. On or about June 2, 2003, the GSA awarded PCL Contract No. GS06PO2GZC0518 ("Contract") for the design-build construction of a federal courthouse ("Courthouse") in Cape Girardeau, Missouri.

**BACKGROUND**

7. On August 30, 2002, the GSA issued the Stage II Request for Proposal ("RFP") for the design-build construction of the Courthouse. PCL submitted its Proposal to the GSA in September 2002 and its Best and Final Offer ("BAFO") in October 2002. PCL's BAFO conceptual design was for a Courthouse with a basement and four floors, as well as an atrium. On June 2, 2003, the GSA awarded the Contract to PCL in the amount of $44,000,000 to finalize the design and construct the Courthouse.

8. Also on June 2, 2003, the GSA issued two Change Orders. Change Order P-1 added certain Value Engineering items contained in the BAFO. Change Order P-2 incorporated

various changes that had been made through a design-review process to the BAFO conceptual design.

9. Change Order P-3, issued in July 2003, included a build-out of the U.S. Marshall's area on the second floor. P-3 had a small increase in steel that was absorbed by the Design Build team. Change Order P-4 involved an extension of the elevator to the basement.

10. From July through September 2003, the GSA directed sweeping changes to the Courthouse structural design in Contract Modifications P-5, P-5a, and P-5b (collectively referred to as the "P-5 Changes"). These changes directly and indirectly affected the design, procurement, and construction of nearly every structural aspect of the Courthouse.

11. The GSA did not direct the P-5 Changes in a change order with an agreed upon price. Instead, the GSA directed PCL to perform the changed work on a "price to be determined later" ("PDL") basis, with a not-to-exceed ceiling price of $315,000.

12. The GSA subsequently increased this ceiling in two steps to $3,440,084. These increases were driven by multiple factors, including the escalating price of materials.

13. The GSA's design changes directly affected the structural steel systems. Furthermore, these design changes caused considerable delays. The GSA has admitted responsibility for an 80 calendar day critical path delay due to design changes. This established PCL's entitlement to 80 days of extended overhead, but did not limit other impact damages, such as those claimed here.

14. The design changes required by the P-5 Changes were extensive. During the conceptual design process, PCL, its design subcontractor, Fentress Bradburn, Architects, LTD. ("Fentress"), and its structural engineer, Martin/Martin Consulting Engineers ("Martin/Martin")

had selected an "X" bracing system (also referred to as "diagonal braced frames") for the perimeter of the building because it was the most efficient and cost effective structural steel bracing system for resisting lateral seismic loads and resisting perimeter progressive collapse. The BAFO design and pricing was based on this "X" bracing.

15. After it awarded the Contract to PCL, the GSA determined that the "X" bracing design was not acceptable aesthetically because structural steel braces were visible in some areas where there were windows. On August 11, 2003, there was a meeting where PCL and Fentress presented various alternative design concepts to the GSA.

16. Over the next six weeks, the GSA made several design changes. It first selected the "Chevron Bracing" option for the visible wall locations. Fentress and Martin/Martin began making these design changes. Then, the GSA abandoned the Chevron Bracing and selected a concrete shear wall option. Fentress and Martin/Martin began making these design changes. Finally, on September 24, 2003, the GSA moved to Eccentric Chevron Braces as the design for the Courthouse structure. Fentress and Martin/Martin began making these design changes.

17. Because the Eccentric Chevron Braces were less stiff than "X" or Chevron Braced frames, additional "X" braced frames were required in the interior of the Courthouse. Also, "X" braced frames were increased in size. This increased the steel tonnage required for the structure.

18. The redesign work relating to these design changes was extensive. Fentress prepared many elevation drawings to show the visual impact of potential structural changes leading up to the selection of Eccentric Chevron Braces. Fentress explored alternative design configurations and went through numerous pricing exercises to determine the most cost-effective strategy that satisfied the GSA's desire to alter the aesthetic appearance of the Courthouse, while

minimizing the impact to the schedule and project costs. Martin/Martin prepared many changes to structural design elements and incurred similar additional engineering costs.

19. Prior to the P-5 Changes being issued, Fentress had met with all building tenants and finalized the interior design. There are approximately 11 tenants including the Courts, GSA, U.S. Marshall, U.S. Attorney, and the Clerk. Coordination with so many tenants, each with special needs, required months of planning, evaluation, preparation of interior plans and other drawings, and meetings, after which the spaces and the interior designs had to be signed off by each tenant. After the P-5 Changes, this process had to be repeated, but an effort was made to minimize changes to the previously-approved interior plans. As a result, the number of diagonal and concentric braces increased because their use allowed Fentress to minimize changes to the previously-approved interior plans, as well as to minimize impacts to the foundation design and construction schedules.

20. PCL's ability to bid and award many subcontract packages was significantly impacted by the P-5 Changes. For example, many subcontractors required 100% Core and Shell Construction Documents ("CDs"), as well as completed Tenant Fit-out Drawings in order to finalize their bids. It was not until the 100% CDs had been completed that the location of walls, beams, doors, etc., was known, so that final bids could be obtained. If PCL had accepted final bids before that time, the likelihood of significant change orders, with further costs to PCL, would have increased. The 100% CDs were not completed until early March 2004. The 100% drawings for "Bid/Pricing Submission" were officially completed on April 19, 2004. Fortunately, by expediting the process and actively working with potential subcontractors, PCL was able to lock in the pricing of all the subcontracts at issue in this claim by this date.

21. The 80 calendar day delay caused by the design changes pushed the bidding process into a period of rapidly escalating material prices. Thus, when PCL was able to receive quotes and execute subcontracts for this impacted work, the buy-out process was further delayed and the prices PCL had to pay had increased tremendously.

22. Throughout the construction industry, late 2003 and early 2004 saw an unprecedented and unpredictable rise in the price of steel and other building materials. Between July 2003 and February 2004, the price of steel scrap rose over 100%. During this period, other construction materials also experienced considerable price increases. Prices for lumber, plywood, gypsum wallboard, stainless steel, copper and fuel all increased. Factors contributing to the price increases were beyond the control of PCL.

23. Until the GSA selected the re-design option it wanted, directed the P-5 Changes, the redesign work was completed, and the construction drawings were finalized, PCL could not obtain firm quotes from, or place orders with its suppliers and subcontractors. By that time, however, materials prices had increased considerably. Moreover, some suppliers and subcontractors would not lock-in prices due to the unpredictable materials markets. This change in market conditions was a direct result of the unprecedented materials price escalation. Absent the GSA's design change delays, PCL would have been able to lock-in prices much earlier.

24. The GSA is responsible for the increased material prices that were directly caused by design delays for which the GSA is responsible. The GSA has acknowledged its responsibility for design delay. That same design delay thereafter delayed and disrupted the procurement phase of the Contract causing PCL to incur additional costs. Therefore, PCL is entitled to the damages outlined below.

25. In January 2005, PCL submitted a $3,967,243.00 proposal to the GSA for additional direct costs and material price escalation due to the P-5 Changes. The GSA Office of Inspector General ("OIG") assigned auditors to review PCL's costs. The objectives of this review were to determine if PCL's proposed costs were supported by appropriate records and were allowable, reasonable, and allocable. In September 2005, the OIG issued a report with its findings (the "OIG Audit Report"). Of the $3,967,243 requested by PCL, the OIG Audit Report computed "per review" recommended amounts of $2,552,967.

26. Subsequently, the GSA issued Unilateral Contract Modification PC-31 ("PC-31") to PCL on December 5, 2005, for $2,380,191. In PC-31, the GSA failed to follow many of the OIG Audit Report recommendations, and did so without explanation. The GSA paid PCL some amounts that had not been recommended in the OIG Audit Report, but failed to include payment to PCL of $356,416 that had been recommended in the OIG Audit Report.

27. In April 2006, PCL submitted a Request for an Equitable Adjustment ("REA") in the amount of $1,032,894. In July 2006, the GSA denied that REA in its entirety. In April 2007, PCL requested a Contracting Officer's Final Decision on a claim certified under the Contract Disputes Act ("Claim") in the amount of $1,034,526. A copy of the Claim Certification is attached as Exhibit 1. On September 24, 2007, the Contracting Officer issued a Final Decision denying the Claim in its entirety. A copy of the Contracting Officer's Final Decision is attached as Exhibit 2. In this action, PCL appeals the denial of that Claim.

**FIRST CLAIM FOR RELIEF**
**(Changes - Failure to Grant Equitable Adjustment – Fentress and Martin/Martin)**

28. PCL realleges and incorporates by reference the allegations of paragraphs 1 though 27.

29. The Contract provides for an equitable adjustment of the contract price for cost increases due to changes in work requested or caused by the GSA.

30. The re-design work required by the P-5 Changes increased PCL's design-related costs. PCL had money in its budget to finalize the GSA-approved conceptual design. PCL did not, however, have money budgeted for substantial GSA changes to the conceptual design. Fentress and Martin/Martin separately tracked their hours for original scope of work and changed work. In the process of re-designing the Courthouse due to the P-5 Changes, Fentress and Martin/Martin incurred additional costs of $150,263.63. PCL is claiming these costs on behalf of Fentress and Martin/Martin. The GSA paid $75,266 in PC-31. PCL is entitled to an additional $74,998 for Fentress and Martin/Martin, plus PCL's mark-ups, for a total of $84,606.

**SECOND CLAIM FOR RELIEF**
**(Changes - Failure to Grant Equitable Adjustment – AFCO Steel)**

31. PCL realleges and incorporates by reference the allegations of paragraphs 1 though 30.

32. The Contract provides for an equitable adjustment of the contract price for cost increases due to changes in work requested or caused by the GSA.

33. The P-5 Changes required the use of an additional 476 tons of structural steel. This is not disputed by the GSA. The GSA and PCL, however, disagree about how to price the additional 476 tons of steel. PCL paid $1,315,000 to AFCO Steel for this additional steel. In PC-31, the GSA based its payment to PCL for the additional steel on the price per ton contained in PCL's October 2002 BAFO. The $62,306 claimed by PCL is the difference between the actual price per ton paid by PCL and the BAFO price. The reasonableness of the actual price paid by PCL is established by other competitive bids for the steel at issue.

34. Pricing this change order work based on the BAFO pricing does not fairly compensate PCL for its costs and is unreasonable. The BAFO conceptual design was changed as early as Change Order P-2. Moreover, using BAFO pricing makes PCL solely responsible for all the steel price increases after the October 2002 BAFO. The GSA, however, is responsible for the price increase because the need for the additional 476 tons of steel was due solely to the GSA-directed design changes.

35. PCL is entitled to an equitable adjustment of $62,306, plus PCL's markups, for a total of $70,288, to compensate PCL for the increased actual price PCL paid for the additional steel required by the GSA-directed design changes.

**THIRD CLAIM FOR RELIEF**
**(Changes - Failure to Grant Equitable Adjustment – Guarantee Interiors, Inc.)**

36. PCL realleges and incorporates by reference the allegations of paragraphs 1 though 35.

37. The Contract provides for an equitable adjustment of the contract price for cost increases due to changes in work requested or caused by the GSA.

38. Because of impacts from the GSA design delays, PCL incurred additional material costs that PCL paid to its drywall subcontractor, Guarantee Interiors Inc. ("Guarantee"), primarily for steel studs and tracks, with lesser amounts for drywall and densglass (a structural wall sheathing similar to gypsum wallboard, with increased resistance to weather and mold). The GSA Audit Report recommended payment of $115,973 of the $431,618 claimed by PCL. The GSA, without explanation, paid PCL nothing on this claim in PC-31.

39. PCL originally planned to solicit and finalize drywall packages from January 14, 2004 to March 6, 2004. Due to design delays caused by the P-5 Changes, the bidding process was delayed until after March 5, 2004, when 100% CDs were complete.

40. PCL solicited bids for the drywall package from seven companies. Five of the seven companies dropped out of the bidding process due to the risk of submitting quotes at a time of unprecedented increases in steel prices. This was the market condition in early 2004, when PCL was trying to secure a drywall subcontractor. Consequently, only two companies submitted bids in April 2004. After performing an internal due diligence review of Guarantee's bid to confirm its reasonableness and evaluating pricing from other potential subcontractors, PCL selected the low bid proposal submitted on April 19, 2004 by Guarantee.

41. PCL has only claimed material price escalation for increases between January 2004, when PCL would have secured drywall bids, and April 2004. The April 2004 prices are what PCL actually paid Guarantee. The January 2004 prices are what PCL would have paid absent the GSA design delay.

42. Guarantee has been paid in full, but PCL has taken a loss of $431,618. Including markups, PCL is entitled to an equitable adjustment of $486,913 to compensate PCL for the increased actual price PCL paid to Guarantee as a result of the GSA delays.

**FOURTH CLAIM FOR RELIEF**
**(Changes - Failure to Grant Equitable Adjustment – Foeste Masonry, Inc.)**

43. PCL realleges and incorporates by reference the allegations of paragraphs 1 though 42.

44. The Contract provides for an equitable adjustment of the contract price for cost increases due to changes in work requested or caused by the GSA.

45. PCL claims $117,108 of additional costs that PCL paid to its masonry subcontractor for the material price escalation of various stainless steel products, including wall ties, pencil rod, edge flashing, dowels, and reinforcing wire. The GSA Audit Report recommendation supports payment of $117,108. In PC-31, the GSA, without explanation, paid PCL nothing on this claim.

46. PCL would have sent out masonry bid packages and secured bids not later than January 2004. However, the potential subcontractors needed final tenant layouts to provide a firm quote. PCL could not significantly advance the bidding process until February 2004, when the 100% CDs were substantially complete. These drawings were finalized in March 2004. These drawings were delayed by the GSA-caused redesign delays.

47. PCL contacted six potential masonry subcontractors. During February and March, PCL worked with the potential bidders to review different options and clarify the scope of work based on finalization of the 100% CDs. Ultimately, PCL received only three bids for the masonry package. Foeste Masonry, Inc. ("Foeste") was the low bidder and Foeste's April 15, 2004 Proposal formed the basis for the subcontract. Foeste's bid included material price increases from February to April 2004. Absent the GSA-caused design delays, PCL would have locked the masonry subcontract pricing before February 2004, instead of the actual date in April 2004.

48. Foeste has been paid in full, but PCL has taken a loss of $117,108. Including markups, PCL is entitled to an equitable adjustment of $132,111 for the increased actual price PCL paid to Foeste as a result of the GSA delays.

**FIFTH CLAIM FOR RELIEF**
**(Changes - Failure to Grant Equitable Adjustment – Rock Hill Mechanical)**

49. PCL realleges and incorporates by reference the allegations of paragraphs 1 though 48.

50. The Contract provides for an equitable adjustment of the contract price for cost increases due to changes in work requested or caused by the GSA.

51. The amount claimed by PCL on behalf of Rock Hill Mechanical Corporation ("Rock Hill") is for material price escalation for galvanized steel duct work, steel and copper pipes, and other mechanical equipment that occurred because of the GSA design delay.

52. PCL originally planned to solicit bids and finalize the mechanical subcontract from August 10, 2003 to October 24, 2003. However, the 100% CDs were not finalized until March 2004, and Rock Hill was unable to confirm its pricing until shortly before that date. A subcontract with Rock Hill was executed on March 5, 2004, based on the February 2004 pricing.

53. Rock Hill has claimed the $80,868 in material price escalation it experienced because it could not lock its pricing until well after October 2003.

54. The OIG Audit Report "verified" the claimed price increases, but the OIG Audit Report only included in its per review amount the $59,721 of increases for steel products, and eliminated $21,147 in verified increases for copper products.

55. In PC-31, the GSA denied the entire amount claimed by Rock Hill, even the verified steel price escalation.

56. With markup, PCL, on behalf of Rock Hill, is entitled to an equitable adjustment of the $91,228 for material price escalation caused by the GSA delays.

## SIXTH CLAIM FOR RELIEF
**(Changes - Failure to Grant Equitable Adjustment – DeLuca Plumbing, L.L.C.)**

57. PCL realleges and incorporates by reference the allegations of paragraphs 1 though 56.

58. The Contract provides for an equitable adjustment of the contract price for cost increases due to changes in work requested or caused by the GSA.

59. The amount claimed by PCL on behalf of DeLuca Plumbing, L.L.C. ("DeLuca") is for material price escalation for copper, PVC, and cast iron pipe due to impacts from the GSA design delay.

60. PCL originally planned to solicit bids and finalize the plumbing subcontract from August 10, 2003 to October 24, 2003. DeLuca submitted a quote on October 21, 2003. This quote was based on the 50% design drawings. Due to design delays caused by the GSA, DeLuca was unable to provide final pricing until February 18, 2004. DeLuca has claimed $75,325 for material price escalation from November 2003 to February 2004.

61. The OIG Audit Report acknowledged that the $75,325 sought was for "PVC, copper and cast iron pipe in addition to other non-steel items used in plumbing." Since the material cost increases were not for steel products, the OIG Audit Report questioned the entire amount. In PC-31 the GSA denied the entire amount claimed by DeLuca.

62. With markups, PCL, on behalf of DeLuca, is entitled to an equitable adjustment of $84,975 for material price escalation caused by the GSA delays.

## SEVENTH CLAIM FOR RELIEF

**(Changes - Failure to Grant Equitable Adjustment – Ahern Fire Protection)**

63. PCL realleges and incorporates by reference the allegations of paragraphs 1 though 62.

64. The Contract provides for an equitable adjustment of the contract price for cost increases due to changes in work requested or caused by the GSA.

65. The amount claimed by PCL on behalf of Ahern Fire Protection ("Ahern") is for material price escalation for the fire protection system pipe, fittings, sprinklers, and fire pumps.

66. PCL originally planned to solicit bids and award the subcontract for fire protection work from October 18, 2003 to February 5, 2004. Due to design delays caused by the GSA, bid dates were pushed back until the 100% CDs were complete in March 2004. Potential subcontractors could not price out the work until the final tenant area designs were finalized. For example, until the use, size and shape of each area was defined, the water sprinkler system could not be configured because the number and placement of the sprinkler heads is based on the use and density of each area. PCL received a bid from Ahern on April 16, 2004. Ahern has claimed $28,043 for material price escalation from February 2004 to April 16, 2004.

67. With markups, PCL, on behalf of Ahern, is entitled to an equitable adjustment of $31,636, for material price escalation caused by the GSA delays.

**EIGHTH CLAIM FOR RELIEF**
**(Changes - Failure to Grant Equitable Adjustment – Aschinger Electric Company)**

68. PCL realleges and incorporates by reference the allegations of paragraphs 1 though 67.

69. The Contract provides for an equitable adjustment of the contract price for cost increases due to changes in work requested or caused by the GSA.

70. The amount claimed by PCL on behalf of Aschinger Electric Company ("Aschinger") is for material price escalation for steel conduit.

71. PCL originally planned to receive bids and award the subcontract for the electrical scope of work from August 25, 2003 to October 6, 2003. Due to design delays caused by the GSA, PCL was unable to secure a bid from Aschinger until October 24, 2003. Aschinger has claimed $19,341 for material price escalation from August to October 2003.

72. With markups, PCL, on behalf of Aschinger, is entitled to an equitable adjustment of $21,819 for material price escalation caused by the GSA delays.

**NINTH CLAIM FOR RELIEF**
**(Changes - Failure to Grant Equitable Adjustment – ThyssenKrupp Elevator Corporation)**

73. PCL realleges and incorporates by reference the allegations of paragraphs 1 though 72.

74. The Contract provides for an equitable adjustment of the contract price for cost increases due to changes in work requested or caused by the GSA.

75. PCL incurred additional costs paid to ThyssenKrupp Elevator Corporation ("ThyssenKrupp") due to material price escalation for steel associated with elevator guide rails and counterweights.

76. PCL originally planned to receive bids and award the subcontract for the elevator package from October 18, 2003 to March 14, 2004. Due to design delays caused by the P-5 Changes, PCL was unable to secure a final bid from ThyssenKrupp until April 19, 2004.

77. PCL has paid ThyssenKrupp in full, and claims material price escalation of $4,358 for price escalation from October 2003 to March 2004.

78. The OIG Audit Report found the proposed increased costs "reasonable." The GSA, however, without identifying any reason, denied the entire amount of this claim.

79. With markups, PCL is due an equitable adjustment of $4,056 for material price escalation caused by the GSA delays.

**TENTH CLAIM FOR RELIEF**
**(Changes - Failure to Grant Equitable Adjustment – REA Preparation Costs)**

80. PCL realleges and incorporates by reference the allegations of paragraphs 1 though 79.

81. The Contract provides for an equitable adjustment of the contract price for cost increases due to changes in work requested or caused by the GSA.

82. As a direct result of the GSA's mandated changes and its repeated failure to pay for the costs associated with these changes, PCL sought the assistance of Sage Consulting Group of Denver, Colorado ("Sage"). Sage assisted in the preparation of the REA. The value of services provided by Sage totals $8,090. These contract administration costs were incurred in an effort to further the negotiation process. PCL is entitled to payment of this amount.

83. Following initial preparation by Sage, Sherman & Howard LLC ("Sherman & Howard") provided a legal review and finalized the REA. The value of services provided by

Sherman & Howard is $9,131. These contract administration costs were incurred in an effort to further the negotiation process. PCL is entitled to payment of this amount.

**ELEVENTH CLAIM FOR RELIEF**
**(Changes - Failure to Grant Equitable Adjustment –Markups on Previously Paid Costs)**

84. PCL realleges and incorporates by reference the allegations of paragraphs 1 though 83.

85. The Contract provides for an equitable adjustment of the contract price for cost increases due to changes in work requested or caused by the GSA.

86. In PC-31, the GSA paid PCL $59,520 for Building Rebar, $18,605 for Caisson Rebar, and $89,845 for Extended Performance Preconstruction. However, the GSA failed to provide PCL with its markups for that work. The GSA owes PCL an additional $16,797 for markups on the Building Rebar, Caisson Rebar, and Extended Performance Preconstruction costs previously paid.

**WHEREFORE,** Plaintiff requests this Court to:

A. Reverse the September 24, 2007, Final Decision of the Contracting Officer and award PCL an equitable adjustment in the amount of $1,046,371;

B. Award CDA interest from April 25, 2007; and

C. Award other and further relief as this Court deems proper.

DATED this 12th day of September, 2008.

Respectfully Submitted,

**SHERMAN & HOWARD L.L.C.**

By: [signature]

Milton L. Smith
90 S. Cascade, Suite 1500
Colorado Springs, CO 80903
(719) 448-4010 (telephone)
(719) 635-4576 (facsimile)
E-mail: msmith@shermanhoward.com

Attorneys for Plaintiff
PCL Construction Services Inc.

**CERTIFICATION**

I certify that this claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief, that the amount requested accurately reflects the contract adjustment for which PCL believes the Government is liable, and that I am duly authorized to certify this claim on behalf of PCL.

Mike Krickbaum

EXHIBIT 1

GSA

GSA Heartland Region

September 24, 2007

Mike L. Krickbaum
Senior Construction Manager
PCL Construction Services, Inc.
2000 South Colorado Blvd., Suite 2-500
Denver, Colorado 80222

Cape Girardeau, Missouri, United States Courthouse
GS06P02GZC0518 (N) – Design Build (NMO94001)

Subject: Contracting Officer's Final Decision
Re: Response to PCL's Claim and Request for Contracting Officer's Final Decision dated April 25, 2007

Mr. Krickbaum:

PCL is requesting additional material costs of $1,034,526 as a result of GSA's change to the design of the building's structural steel system. PCL claims GSA is responsible for these additional costs because its procurement schedule was delayed while PCL was finalizing the design changes. During this time, material prices increased as a result of steel prices spiking rapidly across the industry. Many vendors would not commit to firm prices until delivery. GSA denies its responsibility for this claim in its entirety.

PCL's Claimed Damages:

| PCL Subcontractor/Consultant | Claimed Damages | Notes |
|---|---|---|
| Fentress & Martin/Martin | $74,998 | (a) |
| AFCO Steel | $62,306 | (b) |
| Guarantee Interiors | $431,618 | (c) |
| Foeste Masonry | $117,108 | (d) |
| Rockhill Mechanical | $80,868 | (e) |
| DeLuca Plumbing | $75,325 | (f) |
| Ahern Fire Protection | $28,043 | (g) |
| Aschinger Electric | $19,341 | (h) |
| Thyssen Krupp Elevator | $3,595 | (i) |
| Fees | $141,324 | (j) |
| Total | $1,034,526 | |

EXHIBIT 2

U.S. General Services Administration
1500 East Bannister Road
Kansas City, MO 64131-3088
www.gsa.gov

The following notes reference "Planned" and "Impacted" dates. Planned dates were in PCL's original procurement schedule, CG1A, which was accepted by GSA. GSA extended PCL's contract completion date by 80 days for the P-5b design change, which was reflected in PCL's letter dated August 17, 2004, referencing the updated schedule, CG03. In a majority of the cases, the materials for which PCL seeks additional compensation were ordered *after* the CG03 update #2 schedule dates, leading to PCL's additional costs.

(a) Fentress and Martin/Martin are not due the increase because they did not provide the documentation necessary to substantiate additional proposed costs when requested by the OIG office. GSA included $75, 266 in additional design fees, as a result of the audit review. PCL is claiming $1,718 more than its proposal of January 2005. The chart in PCL's claim on page 22 shows a "disputed amount" of $73,280, but paragraph three on page 23 says they want $74,998.

(b) GSA paid $1,776,503 for structural steel, additional bracing material, additional plates and connections, and additional surcharges in PC31 (P-5b).

(c) While the OIG audit review verified $115,973 in additional costs incurred by Guarantee Interiors, GSA compensated PCL only for costs directly associated with the design change, i.e. steel, additional testing, etc. Drywall is not in the scope of the P-5b change.

(d) Foeste Masonry is not due the increase because the order dates for the stainless steel material were after the impacted procurement dates due to the initiated design changes. PCL continued to procure materials after the impacted dates granted by GSA. Had PCL followed its own procurement schedule, the costs for the material would not have been impacted.

(e) Rockhill Mechanical is not due the increase because the order dates for the steel duct work material were after the impacted procurement dates due to the initiated design changes. PCL continued to procure materials after the impacted dates granted by GSA. Had PCL followed its own procurement schedule, the costs for the material would not have been impacted.

(f) DeLuca Plumbing is not due the increase because the order dates for the steel duct work material were after the impacted procurement dates due to the initiated design changes. DeLuca noted in meetings that the material vendors had sent notices out stating they would not hold their prices on quotes. However, DeLuca could have purchased material and requested additional costs for warehousing to mitigate price increases.

(g) Ahern Fire Protection is not due the increase as its material was procured after the impacted dates. PCL's claim that the Final CDs were not complete until March 2004, thus preventing Ahern from pricing and procuring the materials, is not substantiated. The PCL claim, page 6, 4th paragraph states, "Moreover, prior to P-5 being issued, [August 11, 2003], Fentress had met with all building tenants and finalized the interior design...". The complete layout of the tenant spaces in August 2003 would have afforded Ahern ample time to price and procure the fire sprinkler components had they chosen to do so.

(h) PCL's P-5b proposal requested $27,339 for Aschinger. Of that, $19,341 was verified in the OIG audit review. Aschinger Electric is not due the increase because we verified there was no increase in electrical material costs during the impacted timeframe, for which the OIG review did not consider. PCL's procurement was after the impacted dates.

(i) PCL's P-5b proposal of January 2005 requested $4,358 for Thyssen Krupp Elevator. Of that amount, $3,595 was verified in the OIG audit review, which did not consider the effects of the procurement schedule delay. PCL is not due the increase because the order dates for the steel guide rails and counterweights were after the impacted procurement dates due to the P-5b design changes.

(j) PCL is not entitled to fees for consultants preparing claims against the Government, (Sage Consulting, Sherman & Howard);

(k) PCL is not entitled to insurance costs for the additional value of the claim. GSA compensated PCL for insurance in PC31.

(l) PCL is not entitled to additional fees for extended performance -- preconstruction. GSA compensated PCL for extended performance pre-construction costs of $89,845 in PC31.

(m) Additional onsite inspections and testing were required for the increased steel structure.

(n) Window sizes were reduced to ensure steel bracing was not visible through the windows. This lead to an increase in the building's exterior.

(o) Additional rebar was a result of the change and GSA compensated PCL.

| Line Items affected by P-5b design change | Compensation | Notes |
|---|---|---|
| Structural steel | $1,252,694 | (b) |
| Structural steel bracing | $396,867 | (b) |
| Structural steel plates, connections, surcharges | $126,942 | (b) |
| Additional onsite inspections | $26,700 | (m) |
| Additional fabrication testing | $33,295 | (m) |
| Additional design fees | $75,266 | (a) |
| Additional exterior closure materials | $50,971 | (n) |
| Glass adjustment | $(4,736) | (n) |
| Subtotal for subcontractors' work | $1,957,999 | |
| | | |
| Building rebar | $59,520 | (o) |
| Caisson rebar | $18,605 | (o) |
| Extended performance for pre-construction | $89,845 | (l) |
| Subtotal | $167,970 | |
| | | |
| 4.1% Overhead | $6,887 | |
| 10% fee on subcontractors' work | $195,800 | |
| | $2,328,656 | |
| Bond | $4,293 | |
| | $2,332,949 | |
| Insurance | $47,242 | (k) |
| Total Allocable Modification Costs | $2,380,191 | |

Conclusion:

The claim's conclusion states, "It is unreasonable to draw a line at 80 days and disallow all escalation if buyout occurred after the 80th day".

The 80-day schedule extension was accepted by PCL under no duress. GSA is not responsible for ensuring that PCL follow its own procurement schedule and should not be held responsible for PCL's failure in this critical component of the project. Had PCL notified GSA it was experiencing difficulties with vendors committing to prices prior to delivery to the construction site, GSA would have provided PCL warehouse storage space.

PCL experienced construction delays at no fault of the Government from the beginning of foundation work through structural steel erection. Placing drilled piers took five months longer than PCL's accepted baseline schedule projected. PCL did not consider the site conditions, effort in erecting steel, and the availability of subcontractors at the project's location.

GSA fairly compensated PCL with $2,380,191 for GSA's P-5b design change under unilateral contract modification PC31, signed by the Contracting Officer on December 5, 2005.

This is the final decision of the Contracting Officer. You may appeal this decision to the Civilian Board of Contract Appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the Civilian Board of Contract Appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeal to the Civilian Board of Contract appeals, you may, solely at your election, proceed under the Board's small claim procedures for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the Civilian Board of Contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Carol J. Watkins

Carol J. Watkins
Senior Contracting Officer
Construction Acquisition Services Branch 6PCAI
Project Management Division
Public Buildings Service